# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No 1:20-cv-03334-QJM-STV

| | | |
|---|---|---|
| ROBERT SCOTT MOTHERSHED, | ) | |
| | ) | |
| Plaintiff, | ) | **SECOND AMENDED COMPLAINT** |
| | ) | |
| v. | ) | **JURY DEMAND** |
| | ) | |
| NITROCRETE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Robert Scott Mothershed (the "Plaintiff"), as his Complaint against Nitrocrete LLC (the "Defendant"), states as follows:

### INTRODUCTION

1.     This Complaint sets forth seven causes of action for false representation, negligent misrepresentation, breach of contract, unjust enrichment, and for various civil remedies under the Arizona Wage Act, Arizona Minimum Wage Act, and the Fair Labor Standards Act. The causes of action governed by Arizona law arise from the Plaintiff's employment in Arizona.

2.     The Defendant perpetrated a bait-and-switch regarding the Plaintiff's compensation to fool him into accepting employment with the Defendant and signing closing documents for a business reorganization with Mantucket Capital Management Corporation ("Mantucket," the business reorganization is hereinafter referred to as the "Mantucket

Reorganization"). These documents included an offer letter concerning his employment as Vice-President - Sales (the "Offer Letter") and a Non-Competition Agreement (the "Non-Competition Agreement"). The Non-Competition Agreement has prevented the Plaintiff from working in any capacity in his industry for five years anywhere in North America. To obtain the Plaintiff's signatures, the Defendant made false written assurances to the Plaintiff. First, "under no circumstances will any of the salary, commission or draws be considered a loan requiring repayment." Second, he was earning ongoing sales commissions on all sales of Defendant that "will be paid monthly on the first Friday of each month after the customer payment is received" (the "Ongoing Commissions"), including Double Commissions on all new sales and increases in usage by existing customers over the prior year (the "Double Commissions"). The Defendant paid the Plaintiff as though this was true from the beginning of his employment until the day he was fired. From day the Plaintiff was fired the Defendant withheld all of the Plaintiff's compensation then due and payable, including three weeks pay, a significant amount of his past compensation, and all Ongoing Commissions, including the Double Commissions. The Plaintiff is the victim of the Defendant's double-talk regarding his compensation.

## THE PARTIES

3.      Defendant is a Colorado limited liability company engaged in the concrete cooling business and transacts business in interstate commerce. Defendant has its principal place of business at 4862 Technology Drive, Ft. Collins, Colorado 80525.

4.      The Plaintiff is a citizen and resident of Arizona who was an employee of Defendant from February 1, 2020, until he was fired on August 28, 2020 (the "Termination Date").

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U. S. C. §1332.

6.      This Court has personal jurisdiction over Defendant.

7.      Venue is proper in this Court.

## FACTUAL ALLEGATIONS

**Background**

8.      Beginning in 2016, the Plaintiff was employed with an equipment rental and concrete cooling business operated by the predecessors of the Defendant,  Peak Equipment Rentals and Peak Innovations, Inc. (collectively "Peak Innovations").  Peak Innovations was owned and controlled by Drew Nelson ("Nelson") as manager and owner of various limited liability companies along with other members of his family.

9.       With the Plaintiff's help, Peak Innovations developed a proprietary method and system using specially-configured equipment to cool ready mix concrete ("ready mix") with liquid nitrogen.  Ready mix is produced at a batch plant.  Precise amounts of gravel, sand, water and cement are combined by weight, along with other ingredients, called admixtures, to meet the specifications of a construction project.  Ready mix is sold by volume to construction contractors.  Cooling ready mix with liquid nitrogen improves certain properties of the concrete.

The liquid nitrogen is added during production as the ready mix is loaded into the familiar barrel-shaped cement trucks for delivery to the construction site.

10.     The Plaintiff was considered one of the founders of the business and participated in developing its business model and marketing and sales strategies.  His contributions included the concept, which was adopted, of pricing the product based on gallons of liquid nitrogen used by each customer and collecting usage data using telemetry for billing the customer.

11.     As Vice President - Sales, the Plaintiff had responsibility for meeting the revenue targets of the business.  He conducted educational demonstrations, met with prospective customers to solicit long-term supply contracts, and met with existing customers to increase usage.  In 2019, the Plaintiff successfully solicited approximately 60 contracts.

12.     Nelson proposed to Plaintiff an annual compensation plan effective January 1, 2019.  The proposal provided for a base salary and the incentive of a 5% interest in the profits of the business and the proceeds from any sale of the business of Peak Innovations (the "Equity Interest"). The Plaintiff accepted this proposal.

13.     Under this proposal, the Plaintiff should have been paid $54,402 at the end of 2019.  The Defendant did not make any payment even though the 2019 sales targets were achieved.  As Nelson explained to the Plaintiff, the business was unprofitable due to excessive costs and expenses.

14.     The Plaintiff believed his compensation in 2019 was deficient and his family had been unfairly and negatively impacted by mismanagement of the business.

15.     Nelson also failed to formalize the Equity Interest in writing.

-4-

**The Mantucket Reorganization**

16.     Mantucket signed a Letter of Intent dated December 21, 2019 for the Mantucket

Reorganization.  Under the terms of the Letter of Intent, Mantucket would acquire a 70%

interest, and Nelson and his family would acquire the other 30% interest, in a new holding

company in exchange for substantially all of the assets and certain liabilities of the Business.

Nelson and his family would receive immediate cash payments, believed to total $17,000,000,

and could earn an additional $39,600,000 if certain earnings targets were achieved (the "Earn

Out").  Nelson would retain day-to day-managerial control as Chief Executive Officer, and his

family would be hired as officers and employees in the business, to be rebranded "Nitrocrete."

17.     At the time, Nelson told the Plaintiff he needed him to "stay on," continue his

employment, and "grow the business" as he had done in the past, and that without the Plaintiff

the Defendant and Nelson could not "hit the numbers" or achieve sales targets they had

committed to Mantucket.

**The New Compensation Plan and the Closing**

18.     Accordingly, on January 6, 2020, Nelson proposed to the Plaintiff a new annual

compensation plan.  The Plaintiff initially rejected this plan because his compensation could be

considered a loan requiring repayment.  To assure Plaintiff this was not the case, Nelson wrote on

the proposal, "[u]nder no circumstances will any of the salary or commissions be considered a

loan requiring repayment," and signed it to further evidence his promise.

19.     The proposed closing date of the Mantucket Acquisition was January 31, 2020

(the "Closing").  The Mantucket Acquisition could not close without the Plaintiff's signatures on

certain documents.  The Defendant put increasing pressure on the Plaintiff to sign them as the Closing approached.

20.    One such document was the Offer Letter signed by Nelson extending an offer of employment beginning February 1, 2020, in the position of Vice President - Sales and setting forth terms and conditions of the offer:

> [The Company] is pleased to offer you employment….
>
> …
> You will be paid of $9,615.38 per bi-weekly pay period ($250,000 annually), which is a combination of $5,679.23 base pay and $3,936.15 as a draw against the commission payments detailed below.
> …
> You will also be paid a sales commission of $.005 on per gallon for all gallons sold fleet-wide up to the prior years volume, then $.01 per gallon thereafter.  Sales commission will be paid monthly on the first Friday of every month after the customer payment is received.
> …
> Paid time off … will accrue at 4.614 hours per period.
> …
> If you accept the above-described offer, please sign and return all pages of the letter as soon as possible.

21.    On or about Tuesday, January 28, and Wednesday, January 29, 2020, the Plaintiff discussed his concerns about compensation and the Equity Interest with the Defendant and Nelson.  The Defendant and Nelson wanted the Plaintiff to sign a $1,485,500 promissory note in connection with the acquisition of the Equity Interest.  The Plaintiff refused to sign it because he Equity Interest was owed him for past services and he did not owe any money for it.  The Plaintiff also advised them he could not meet the deadline for the Closing due to travel to Atlanta for sales meetings and the lack of any time for document review.

22.     On January 29, 2020, the Defendant told Plaintiff "[w]e have just found out the investors will hold up closing if they don't have all our offer letters completed today!"  The Plaintiff still would not sign the Offer Letter because the Offer Letter failed to address his concern that his compensation should be considered a loan requiring repayment.  Nelson and others were increasingly anxious and upset at the Plaintiff's unwillingness to sign.

23.     On Friday, January 31, 2020, Nelson sent a clarifying email to Plaintiff:

In an effort to alleviate any concerns around our arrangement, I've reiterated my intent in the attached letter.  As we discussed on the phone wednesday night, I've implemented the plan we put together Jan 6 in 2 parts...

1) The first part is the employment offer letter you received from dawn last week. Her letter addressed several items from the Jan 6 plan - specifically, the base pay, benefits, commission, & draw - but other pieces are clearly missing.

2)  I've put together the attached a new letter with an effective date AFTER the employment offer letter.  This addresses the items not addressed by the employment package, and basically gives you back anything you feared may have been taken away, and is intended to make you 100% whole - back to the deal we had Jan 6.

Along with this clarification, Nelson provided a new proposal that included the following representation:

**Under no circumstances will any of the salary, commission or draws be considered a loan requiring repayment.**

The Plaintiff understood this clear, absolute and unambiguous statement to have the meaning and effect that under no circumstances would he have to pay back any of his compensation, including any "draws," and specifically the "draw against commissions" referred to in the Offer Letter, including the one attached to the email.

24.     Nelson concurrently told the Plaintiff "Mantucket is asking all founders to sign a non compete" and attached the Non-Competition Agreement to the email.  Nelson was also a party to the Non-Competition Agreement and was well aware of the onerous restrictions it imposes on the Plaintiff's future employment for five years.  The Defendant has never released Plaintiff from the Non-Competition Agreement.

25.     Nelson made these representations knowingly and with an intent to defraud the Plaintiff into accepting and continuing employment for Defendant's benefit to "grow the business" by soliciting new customers and servicing existing customers with Ongoing Commissions, including the Double Commissions, and, (b) in order to obtain the Plaintiff's signatures to documents for the Closing, including the Offer Letter, the onerous Non-Competition Agreement, along with other documents.  In connection with the Closing, Nelson and his family received and would receive in the future millions of dollars for the assets of the business, for salary and benefits from employment, and from the Earn Out and other cash distributions in the future.  In addition, Nelson made the representations with the plan and intent to fire the Plaintiff once the Plaintiff had outlived his usefulness and was replaced.

26.     In reliance on Nelson's clear, absolute and unambiguous statement that under no circumstances would he have to pay back any of his compensation, including any "draws," and specifically the "draw against commissions"in the Offer Letter, and believing it to be true, the Plaintiff (a) signed an Offer Letter, the Non-Competition Agreement and other Closing documents, (b) accepted, continued and not quit employment with Defendant, and (c) worked hard to "grow the business."

27.      In the first eight months of 2020, the Plaintiff solicited approximately 55 new long-term supply contracts in eight months - a higher rate than 2019 - and continued to service existing contracts. The Defendant paid the Plaintiff without making any unauthorized deductions from his compensation in accordance with the promises made by the Defendant and Nelson, and the Plaintiff's understanding thereof, on which the Plaintiff was relying.

28.      Had he known the Defendant and Nelson were misrepresenting his compensation, the Plaintiff would not have (a) signed an Offer Letter, the Non-Competition Agreement and other Closing documents, (b) accepted, continued and not quit employment with Defendant, and (c) worked hard to "grow the business."  These false representations include "under no circumstances will any of the salary, commission and draws be considered a loan requiring repayment" including the draw referred to as a "draw against commissions" in the Offer Letter, and that he was earning Ongoing Commissions, including the Double Commissions.  Had the Plaintiff learned the foregoing assurances were false at any time, he would have quit immediately. The Defendant and Nelson knew and could reasonably forsee this and concealed the truth from the Plaintiff so that he would act on their concealment until they were ready to get rid of him on their own terms.

### DEFENDANT FIRES PLAINTIFF AND COMMITS WAGE THEFT

29.      On or about Tuesday, August 25, 2020, the Defendant's Chief Operating Officer, Mike Schauer, met with the Plaintiff and customers in Arizona.  Schauer told them there was no more installation capacity to fulfill several contracts the Plaintiff had just solicited.

30.     On Friday, August 28, 2020, Nelson fired the Plaintiff over the telephone. Nelson told the Plaintiff COVID-19 was hurting business and he would not be getting a paycheck that day.  Nelson also told him he hoped he could bring him back after the slow season on a straight-commission basis.

31.     Although August 28, 2020 was a payday, the Defendant withheld all of the Plaintiff's compensation, including three weeks pay for working from and after August 8, 2020 and a significant amount of his past compensation.  The Defendant withheld pay without authorization for the deductions it made and despite its promises that "under no circumstances would any of the salary, commission or draws be considered a loan requiring repayment."  The Defendant deliberately failed to provide the legally required statement setting forth his earnings and deductions from earnings in order to conceal the actions it had taken and intended to take with respect to his compensation.

32.     Later that day, the Defendant's Human Resources Manager, Tracy Barger told the Plaintiff: "we encourage you to apply for unemployment under the COVID 19 clause."  Ms. Barger also told Arizona unemployment the reason for the firing was COVID-19.  On information and belief the Defendant applied for and received one or more federal grants through Payroll Protection Act Loans based in part on up to $100,000 of the Plaintiff's compensation (the "PPP Funds").  On information and belief, these loans have been, or will be, forgiven.

33.     In addition, Ms. Barger provided the Plaintiff a Separation Agreement stating:

**In accordance with Plaintiff's compensation plan, Plaintiff received regular draw payments as a loan to be paid with commission earned in the event he does not earn enough commission to pay back the draw.**

The Defendant partially paid off the supposed loan to the Plaintiff by withholding $14,427.03 in compensation, including salary, for three weeks the Plaintiff worked from and after August 8, 2020.  The Defendant also stated the Plaintiff owed an additional $8,873.72 for the supposed loan and offered to forgive this loan amount if the Plaintiff  provided a waiver and release of all claims against the Defendant along with a covenant not to sue or disparage the Defendant.

34.     On October 9, 2020, Defendant presented to the Plaintiff for signature a Separation Agreement identical to the earlier one except for the fact the Defendant claimed the Plaintiff now owed a larger amount on the purported "loan."

35.     The Defendant represented to the Plaintiff  "commissions will be paid monthly after the customer payment is received." This means once the customer paid, the commissions were vested, due and payable.  The Plaintiff caused customers to enter into approximately 115 long-term supply contracts on extended payment terms.  The Plaintiff thereby earned Ongoing Commissions, including Double Commissions, that could not be definitively determined on the Termination Date because future customer payments were then unknown and the applicable commission rate – single versus double – cannot be determined without customer usage data, including "new" versus "old" gallons, that did not exist at the time of the Defendant's calculations of the alleged loan amount.

36.     By contradicting its representations and in the absence of necessary data, the Defendant acted unreasonably and in bad faith in claiming the Plaintiff was in debt for an alleged

loan and in making the loan amount calculations provided on August 28, 2020 and October 9, 2020.

37.     The Defendant's failure to pay ongoing commissions was also contrary to the Defendant's practices and course of conduct to pay ongoing commissions to other employees.

38.     After the Termination Date, the Plaintiff demanded payment of the federal and Arizona minimum wage for the last three weeks of his employment.  The Defendant failed and refused to pay. After this action was commenced, on or about October 26, 2020, the Plaintiff received from Defendant an Earnings Statement for the period October 31, 2020, along with a check dated October 26, 2020, for $1,003.78.  The Earnings Statement states the Plaintiff earned total gross pay of $1,440.00 at the rate of $12.00 per hour for 120 hours, the equivalent of three weeks pay at the applicable Arizona minimum wage.

39.     On information and belief, the payment was a belated attempt by the Defendant after this action was commenced to cure its violations of the FLSA and Arizona Minimum Wage Act with respect to the last three weeks of Plaintiff's employment.  The Plaintiff's FLSA and Arizona Minimum Wage Act claims are not moot as a result of the Defendant's belated payment because it omitted payment of statutory liquidated damages and attorney's fees.

40.     The Plaintiff demanded and the Defendant failed and refused to pay the Plaintiff accrued paid time off.  A June 26, 2020 memorandum from Kathleen Walton, Chief Financial Officer to employees stated the next paycheck would include payment therefor.

41.     As a direct and proximate result of the course of wrongful conduct engaged in by the Defendant, and its failure to take remedial action, the Plaintiff has been out of work and has

been forced to claim unemployment benefits, retain counsel and incur legal fees and costs to issue demands for compensation and to litigate this action.

42.     The Defendant and Nelson acted (a) purposefully with the full realization of the danger of loss or damage to the Plaintiff, (b) recklessly, (c) heedlessly, (d) without regard for the consequences, and (e) without regard for the rights of the Plaintiff.

43.     The Defendant and Nelson acted in a fraudulent, malicious, and willful and wanton manner, justifying an award of punitive damages.

**FIRST CLAIM FOR RELIEF**
**FALSE REPRESENTATION**

44.     Paragraphs 1 through 43 are re-alleged and incorporated by reference herein.

45.     The Defendant by words and conduct made one or more fraudulent and false representations that:

(a)     The Plaintiff's compensation was $250,000 annually plus commissions.

(b)     The Plaintiff earned Ongoing Commissions and Double Commissions.

(c)     "Under no circumstances will any of the salary, commission or draws be considered a loan requiring repayment." The Defendant reiterated this representation through its conduct by repeatedly paying the Plaintiff as though it was true beginning the first day of his employment until the Termination Date.  The Plaintiff understood this clear, absolute and unambiguous statement and the Defendant's ensuing conduct to have the meaning and effect that under no circumstances would he have to pay back any of his compensation, including any "draws," and specifically any "draw against commissions" referred to in the Offer Letter. The

Plaintiff, based on this and earlier statements by Defendant, and its conduct, specifically understood Defendant to mean no matter what the circumstances none of his pay would ever have to be repaid.

46.     These representations were material because a reasonable person deciding whether to accept and to continue employment would regard pay as important. The Defendant and Nelson knew the Plaintiff was averse to and specifically rejected compensation "considered a loan requiring repayment" and would be motivated in his work by the Ongoing Commissions, including the Double Commissions.

47.     The representations were material because the Defendant and Nelson knew and could readily foresee that had the Plaintiff known these representations were false the Plaintiff would not have (a) signed an Offer Letter, the Non-Competition Agreement, or other Closing Documents, (b) accepted, continued, and not quit employment with Defendant, and (c) given the promise of Double Commissions, worked hard to "grow the business" through new sales and increased usage by existing customers.

48.     The Defendant and Nelson made these representations knowingly, recklessly and with an intent to defraud the Plaintiff into (a) signing an Offer Letter, the Non-Competition Agreement and other Closing documents, and (b) accepting, continuing and not quitting employment with Defendant, and (c) given the promise of Ongoing Commissions and the Double Commissions, working hard to "grow the business" through new sales and increased usage by existing customers.

49. Nelson was motivated to defraud the Plaintiff because a result of the Closing, Nelson and his family received and would receive in the future millions of dollars for the assets of the business, for salary and benefits from employment, and from the Earn Out and other future cash distributions.

50. The Defendant and Nelson made these representations in order to create a false impression in the mind of the Plaintiff with the intent such false impression would be accepted as true by the Plaintiff and with the intent that he would rely on and be deceived by the representations to (a) sign an Offer Letter, the Non-Competition Agreement and other Closing documents, (b) accept, continue and not quit employment with the Defendant, and (c) work hard to "grow the business."

51. Alternatively, the Defendant and Nelson knew that by their own unclear or deceptive words or conduct they created a false impression in the mind of the Plaintiff of the actual facts concerning his compensation. When they learned the representations were not true and knew that Plaintiff was acting under the impression that the false representations were true, they failed to disclose the truth and correct the false impression their false representations had created in the mind of the Plaintiff in breach of the common law duty to disclose.

52. The Plaintiff relied on the representations.

53. The Plaintiff's reliance was reasonable and justified because the Defendant and Nelson made the representations to the Plaintiff the "in an effort to alleviate any concerns" he had. The Plaintiff was averse to and had rejected compensation that could be considered a loan requiring repayment. He had already refused to sign the Offer Letter and other Closing

documents for such reason.  Knowing this, the clear, absolute and unambiguous assurance by the Defendant and Nelson that "under no circumstances will any of the salary, commission or draws be considered a loan requiring repayment" and their conduct in paying the Plaintiff as though it was true beginning the first day of his employment until the Termination Date directly responded to and allayed the Plaintiff's concerns about the ability of the Defendant to claw back any of his compensation, particularly the promised commissions.  The Plaintiff's reliance was also reasonable and justified because employees, including the Plaintiff, rely on and depend on the employer for accurately communicating information about compensation and have no particular reason to expect an employer to communicate false information.  The Plaintiff in fact did rely and depend on the Defendant and Nelson, and having no reason to believe they were communicating false information.

54.     Had he known there was any possibility his compensation could be considered a loan requiring repayment or that he was not going to be paid Ongoing Commissions, including the Double Commissions, the Plaintiff would not have (a) signed an Offer Letter, the Non-Competition Agreement, or other Closing Documents, (b) accepted, continued and not quit employment with Defendant, and (c) worked hard to "grow the business."

55.     As a result of the fraudulent and false representations by the Defendant and the Plaintiff's reasonable and justified reliance thereon, the Plaintiff incurred damages in an amount to be proven at trial of at least $75,000, including:

(a)     Annual compensation of $250,000 from the period February 1, 2020, through the expiration date of the Non-Competition Agreement, January 31, 2025 in the amount of

$1,250,000 reduced by (i) compensation already paid, (ii) unemployment benefits received by Plaintiff, and (iii) other income received by the Plaintiff during the five-year period.

(b)     Commissions in an amount to be determined at trial during the period February 1, 2020 through January 31, 2025, reduced by any amount necessary to adjust for any commission payments (i) already made or (ii) included in any other award of damages.

(c)     Accrued paid time off at the rate of 4.615 hours per bi-weekly pay period in the approximate amount of $5,824.

**SECOND CLAIM FOR RELIEF**
**ALTERNATIVE CLAIM – NEGLIGENT MISREPRESENTATION CAUSING LOSS IN A BUSINESS TRANSACTION**

56.     The Plaintiff alleges this claim in the alternative to the claim for false representation.

57.     Paragraphs 1 through 43 are re-alleged and incorporated by reference herein.

58.     The defendant gave false information to the Plaintiff that:

(a)     The Plaintiff's compensation was $250,000 annually plus commissions.

(b)     The Plaintiff earned Ongoing Commissions and Double Commissions.

(c)     "Under no circumstances will any of the salary, commission or draws be considered a loan requiring repayment." The Defendant reiterated this representation through its conduct by repeatedly paying the Plaintiff as though it was true beginning the first day of his employment until the Termination Date.  The Plaintiff understood this clear, absolute and unambiguous statement and the Defendant's ensuing conduct to have the meaning and effect that under no circumstances would he have to pay back any of his compensation, including any

"draws," and specifically any "draw against commissions" in the Offer Letter. The Plaintiff, based on this and earlier statements by Defendant, and its conduct, specifically understood Defendant to mean no matter what the circumstances none of his pay would ever have to be repaid.

60.     This foregoing information was false because from and after the Termination Date, the Defendant in fact treated his salary, commission and draw as a loan requiring repayment and Defendant did not pay the Plaintiff the Ongoing Commissions, including any Double Commissions.

61.     The Defendant gave such information to the Plaintiff in the course of a transaction in which the Parties had a financial interest.

62.     The Defendant gave the information to the Plaintiff for the guidance and use of the Plaintiff in a business transaction wherein the Plaintiff was deciding whether to accept employment and continue working for the Defendant and whether to sign an Offer Letter, Non-Competition Agreement and other documents for the Closing.

63.     The Defendant was negligent in obtaining or communicating the information.

64.     The Defendant gave the information with the intent or knowing that the Plaintiff would act or decide not to act in reliance on the information.

65.     The Plaintiff relied on the information supplied by the Defendant.  Had he known there was any possibility his compensation could be considered a loan requiring repayment or that he was not going to be paid Ongoing Commissions, including the Double Commissions, the Plaintiff would not have (a) signed an Offer Letter, the Non-Competition Agreement, or other

Closing Documents, (b) accepted, continued and not quit employment with Defendant, and (c) worked hard to "grow the business."

66.     The Plaintiff's reliance is justified and reasonable because the Defendant and Nelson made the representations to the Plaintiff the "in an effort to alleviate any concerns" he had.  The Plaintiff was averse to and had rejected compensation that could be considered a loan requiring repayment.  He had refused to sign the Offer Letter and other Closing documents for such reason.  Knowing this, the clear, absolute and unambiguous assurance by the Defendant and Nelson that "under no circumstances will any of the salary, commission or draws be considered a loan requiring repayment" and their conduct in paying the Plaintiff as though it was true beginning the first day of his employment until the Termination Date directly responded to and allayed the Plaintiff's concerns about the ability of the Defendant to claw back any of his compensation, particularly the promised commissions.

67.     The Plaintiff's reliance was also reasonable and justified because employees, including the Plaintiff, rely on and depend on the employer for accurately communicating information about compensation and have no particular reason to expect an employer to communicate false information.  The Plaintiff in fact did rely and depend on the Defendant and Nelson, and having no reason to believe they were communicating false information.

68.     As a result of the false representations by the Defendant and the Plaintiff's reasonable and justified reliance, the Plaintiff incurred damages in an amount to be proven at trial of at least $75,000, including:

(a)     Annual compensation of $250,000 from the period February 1, 2020, through the expiration date of the Non-Competition Agreement, January 31, 2025 in the amount of $1,250,000 reduced by (i) compensation already paid, (ii) unemployment benefits received by Plaintiff, and (iii) other income received by the Plaintiff during the five-year period.

(b)      Commissions in an amount to be determined at trial during the period February 1, 2020 through January 31, 2025, reduced by any amount necessary to adjust for any commission payments (i) already made or (ii) included in any other award of damages.

(c)     Accrued paid time off at the rate of 4.615 hours per bi-weekly pay period in the approximate amount of $5,824.

### THIRD CLAIM FOR RELIEF
### BREACH OF CONTRACT

69.     Paragraphs 1 through 43 are re-alleged and incorporated by reference herein.

70.     By words and actions of the Defendant and Nelson both before and after Plaintiff accepted full-time employment with Defendant as Vice President - Sales, Defendant and Plaintiff entered into an express contract and/or an implied contract that Defendant would compensate the Plaintiff in a accordance with such contract and "under no circumstances will any of the salary, commission or draws be considered a loan requiring repayment," including any "draws," including the "draw against commissions" referred to in the Offer Letter.

71.     Such words and conduct include the e-mails and proposals from Nelson to the Plaintiff, the Offer Letter, and the practice and course conduct of the Defendant in paying the

Plaintiff without treating any of the salary, commission or draws a loan requiring repayment from the beginning of his employment until the Termination Date.

72.     As a result of the breach of contract by the Defendant's failure to pay compensation, commissions and paid time off, the Plaintiff incurred damages in an amount to be proven at trial of at least $75,000, including:

(a)     Annual compensation of $250,000 from the period February 1, 2020, through the expiration date of the Non-Competition Agreement, January 31, 2025, in the amount of $1,250,000 reduced by (i) compensation already paid, (ii) unemployment benefits received by Plaintiff, and (iii) other income received by the Plaintiff during the period in an amount to be determined at trial.

(b)      Commissions in an amount to be determined at trial during the period February 1, 2020 through January 31, 2025 reduced by any amount necessary to adjust for any commission payments (i) already made or (ii) included in any other award of damages.

(c)     Accrued paid time off at the rate of 4.615 hours per bi-weekly pay period in the approximate amount of $5,824.

**FOURTH CLAIM FOR RELIEF**
**ALTERNATIVE CLAIM – UNJUST ENRICHMENT**

73.     The Plaintiff alleges this claim in the alternative to his third claim for breach of contract.  To the extent there was no written contract and to the extent that there was no oral or implied contract, then the Plaintiff alleges a claim for unjust enrichment.  During this action, Defendant contends the Offer Letter is not an enforceable contract in reliance on a disclaimer

therein that employment was at will and compensation may change from time to time for any reason at the Defendant's discretion.

74.     Paragraphs 1 through 43 are re-alleged and incorporated by reference herein.

75.     At the specific request of Defendant, and for its use and benefit, the Plaintiff provided services as an employee of the Defendant and the Defendant accepted the benefit of such services and it would be unjust for the Defendant to retain the benefit of the Plaintiff's services without payment therefor.

76.     The value of the services performed for the Defendant by the Plaintiff for which he has not been paid is at least $75,000, although the exact amount is to be determined at trial.

77.     During and since the performance of the services by the Plaintiff, the Defendant has failed to pay the Plaintiff and there is due and owing to the Plaintiff from the Defendant the principal sum amount at least $75,000.

78.     The Defendant has been unjustly enriched in the amount of at least $75,000, including:

(a)     $14,427.03 in compensation for three weeks the Plaintiff worked from and after August 8, 2020.

(b)      Commissions in an amount to be determined at trial during the period February 1, 2020 through January 31, 2025 reduced by any amount necessary to adjust for any commission payments (i) already made or (ii) included in any other award of damages.

(c)     Accrued paid time off at the rate of 4.615 hours per bi-weekly pay period in the approximate amount of $5,824.

(d)     On information and belief, to the extent the Defendant fired the Plaintiff and took advantage of his employment to obtain PPP funds for purposes other than compensating Plaintiff, the Defendant has been unjustly enriched in the amount of PPP funds it received using Plaintiff's salary and commissions.  The exact amount of the PPP Funds is to be determined through discovery and at trial.

### FIFTH CLAIM FOR RELIEF
### VIOLATION OF ARIZONA WAGE ACT
### (ARIZONA REVISED STATUTES § 23-355)

79.     The allegations of paragraphs 1 through 43 are re-alleged and incorporated herein by this reference.

80.     The Defendant willfully failed and refused to pay wages that were due and payable to the Plaintiff on and after the Termination Date under any agreement in violation of A. R. S. § 23-353 (A) requiring prompt payment of wages upon discharge of an employee, including:

(a)     Pay at the bi-weekly pay rate of $9,135.08 from and after August 8, 2020.

(b)     Commissions in an amount to be determined at trial during the period February 1, 2020 through January 31, 2025 reduced by any amount necessary to adjust for any commission payments (i) already made or (ii) payments included in any other award of damages.

(c)     Accrued paid time off at the rate of 4.615 hours per bi-weekly pay period in the approximate amount of $5,824.

81.     The Plaintiff's salary, commissions and paid time off constitute wages within the meaning of Arizona Revised Statutes § 23-350.

82.     The wage theft by the Defendant in violation of the Arizona Wage Act was willful.  The Defendant knew or should have known, and recklessly disregarded its statutory obligations to maintain accurate payroll books and records, to pay wages to the Plaintiff, to have written authorization for any deductions and a reasonable basis to withhold wages, and in complete and utter disregard of its repeated representations to the Plaintiff that "under no circumstances will any of the salary, commission or draw be considered a loan requiring repayment."

83.     The Defendant, in complete and utter disregard for its responsibilities and the rights of the Plaintiff as an employee unreasonably failed to pay wages without a good faith dispute as to some or all of said unpaid wages and made unauthorized deductions without his written authorization.

84.     The Defendant tried to conceal its unlawful conduct behind a bogus dispute based on arbitrary assumptions, false factual contentions unsupported by records, and other inaccurate data resulting from the negligent manner in which the Defendant keeps its payroll books and records.

85.     The Defendant acted in bad faith in contending that the Plaintiff was paid more than he earned.

86.     Moreover, this dispute was in whole or part created by the careless and cavalier manner in which the Defendant handled its bookkeeping, wage records, and its investigation after the Termination Date of the Plaintiff's complaints.

87.     Pursuant to A. R. S.  § 23-355, the Defendant is liable to the Plaintiff for treble the amount of the unpaid wages in an amount to be proven at trial, plus attorney fees, costs and pre-judgment and post-judgement interest.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF ARIZONA MINIMUM WAGE ACT
### (ARIZONA REVISED STATUTES § 23-364(G))

88.     Paragraphs 1 through 43 are incorporated by reference herein.

89.     The Defendants willfully and improperly failed to compensate the Plaintiff for working from and after August 8, 2020.

90.     As a result, at the time this action was commenced, the Defendant had failed to pay the applicable Arizona minimum wage to the Plaintiff.

91.     The Defendant's practice of willfully and improperly deducting amounts from the Plaintiff's pay violated the Arizona Minimum Wage Act, Arizona Revised Statutes § 23-364(G), as evidenced by Defendant's payment of minimum wage to plaintiff after this action was commenced.

92.     The Defendant is liable to the Plaintiff for the full applicable minimum wage at an hourly rate, to be proven at trial, statutory liquidated damages of one time the amount of unpaid minimum wages, reasonable attorney's fees, court costs and pre- and post-judgment interest.

### SEVENTH CLAIM FOR RELIEF
### VIOLATION OF § 16(B) OF THE FAIR LABOR STANDARDS ACT
### (29 U. S. C. §216(B))

93.     Paragraphs 1 through 43 are incorporated by reference herein.

94.     The Defendants willfully and improperly failed to compensate the Plaintiff for working from and after August 8, 2020.

95.     As a result of its failure to pay wages, commissions and paid time off, the Defendants had failed to pay the applicable minimum wage to the Plaintiff at the time this action was commenced.

96.     The Defendant's practice of willfully and improperly deducting certain amounts from the Plaintiff's pay violated the FLSA, 29 U. S. C. § 216(a), as evidenced by Defendant's payment of the minimum wage to plaintiff **after the commencement of this action.**

97.     The Defendant is liable to the Plaintiff for the full applicable minimum wage at an hourly rate, to be proven at trial, statutory liquidated damages of one time the amount of unpaid minimum wages, reasonable attorney's fees, court costs and pre- and post-judgment interest.

### PRAYER FOR JUDGMENT

The Plaintiff prays for judgment against the Defendant for such legal and equitable relief as the law provides.

### JURY DEMAND

The Plaintiff demands trial by jury.

Respectfully submitted this 1st day of March 2021.

GUARDI LLP
*s/ Noel Guardi*
Noel Guardi
Attorneys for Plaintiff Robert
 Scott Mothershed
2400 Jasper Court
Boulder, CO 80304
Telephone: 720-891-1818
guardillp@icloud.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of March 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and served a true and accurate copy of the same upon counsel for Defendant by email:

David L. Zwisler     david.zwisler@ogletree.com
Steven R. Reid         steven.reid@ogletree.com

*s/ Noel Guardi*_____
Noel Guardi, Attorney for Plaintiff